# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| GRAMERCY EMERGING MARKETS FUND, BALKAN VENTURES LLC, and RILA VENTURES LLC, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) C.A. No. 10321-VCG |
| ALLIED IRISH BANKS, P.L.C. and BULGARIAN-AMERICAN ENTERPRISE FUND, | ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Date Submitted: September 14, 2016
Date Decided: December 30, 2016

Stephen B. Brauerman, Vanessa R. Tiradentes, and Sara E. Bussiere, of BAYARD, P.A., Wilmington, Delaware; OF COUNSEL: Sean F. O'Shea, Michael E. Petrella, Amanda L. Devereux, and Brian B. Alexander, of BOIES, SCHILLER & FLEXNER, New York, New York, *Attorneys for Plaintiffs Gramercy Emerging Markets Fund, Balkan Ventures LLC, and Rila Ventures LLC*.

Kevin R. Shannon and Christopher N. Kelly, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Walter C. Carlson and Elizabeth Y. Austin, of SIDLEY AUSTIN LLP, Chicago, Illinois, *Attorneys for Defendant Allied Irish Banks, p.l.c*.

Kenneth J. Nachbar, Ryan D. Stottmann of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Brian D. Sieve, P.C. and Jessica L. Staiger, of KIRKLAND & ELLIS LLP, Chicago, Illinois, *Attorneys for Defendant Bulgarian-American Enterprise Fund*.

GLASSCOCK, Vice Chancellor

The factual background of this case is baroque. The Plaintiffs are an investment fund—a corporate citizen of the Cayman Islands doing business out of Greenwich, Connecticut—and its two wholly-owned subsidiaries. The Plaintiffs owned 26% of a bank that is a corporate citizen of, and which does business in, Bulgaria. Majority control of the Bulgarian bank was held by a non-profit entity incorporated in Delaware. The non-profit was created by the Congress of the United States in 1991, to facilitate investment and the development of market capitalism in Bulgaria, then newly emerging from Soviet domination.

In 2008, the non-profit sold a 49.99% interest in the Bulgarian bank to a bank holding company, a corporate citizen of Ireland. According to the Plaintiffs, this triggered a right of all minority stockholders in the bank to participate in the sale, "pursuant to Article 149 of the Bulgarian Public Offer[ing] of Securities Act" (the "Bulgarian POSA").[1] According to the Complaint, that act triggers a participatory right for minority stockholders upon a sale of a majority stake in a publicly-traded company. The Plaintiffs contend that the sale of stock from the non-profit to the Irish entity was a "*de facto*" sale of control, triggering the requirement that the Irish entity make a mandatory tender offer for all outstanding bank stock. Alternatively, the Plaintiffs assert there was a secret voting agreement between the non-profit and the Irish bank, evidenced by a purported voting pattern, in circumvention of the same

---

[1] Compl. ¶ 34.

regulation.  Whether the Bulgarian POSA should be so interpreted appears to present a novel question of Bulgarian law, and forms a key legal issue presented in this litigation.

The initial question before me is more fundamental.  Is Delaware an appropriate forum?  The Defendants have moved to dismiss on *forum non conveniens* grounds, arguing that Bulgaria is the clearly-appropriate forum for this litigation.  They made this same argument, successfully, as defendants before an Illinois court, in a virtually identical action involving the same plaintiffs.  This raises an interesting question under the *forum non conveniens* doctrine: how should the Court address such serial filers?

The parties agree that a motion to dismiss on *forum non conveniens* grounds is addressed to the discretion of this Court, but fundamentally disagree as to the appropriate scope of the exercise of that discretion.  Where a litigant has made a first choice of venue (within jurisdictional limits), that choice is entitled to strong deference.  Such deference is attributable to public policy concerns involving comity and avoidance of forum-shopping.  So strong is the deference in favor of a plaintiff's choice of forum, that our case-law describes the showing required to defeat the plaintiff's first choice as one of "*overwhelming* hardship."[2]  Recent cases have

---

[2] *See, e.g.*, *Chrysler First Bus. Credit Corp. v. 1500 Locust Ltd. P'ship*, 669 A.2d 104, 108 (Del. 1995) (emphasis added).

clarified that that adjective is not to be read as preclusive, but also make clear that a defendant must demonstrate that the plaintiff's choice of forum is manifestly unreasonable before a court may dismiss on grounds of *forum non conveniens*.[3]

Such considerations are absent when a litigants' first choice of forum is not Delaware. Where a matter has been first-filed elsewhere, interests of comity and the avoidance of forum shopping cut the other way, and this Court is able to "freely" exercise its discretion to dismiss or stay in favor of the first-filed action, as justice requires.[4] These two doctrines are colloquially referred to by the seminal cases setting them forth; the *forum non conveniens* analysis for cases first-filed in Delaware is the overwhelming hardship test, analyzed via the *Cryo-Maid* factors; the analysis used where another, earlier-filed action is pending elsewhere is known as the *McWane* doctrine.

This case must, as I see it, be analyzed under the latter standard, despite the fact that no earlier-filed actions remain pending. The Defendants argue that the interests of justice weigh strongly in favor of the litigation proceeding, if at all, in

---

[3] *See Martinez v. E.I. DuPont de Nemours & Co.*, 86 A.3d 1102, 1106 (Del. 2014), *as revised* (Mar. 4, 2014) ("To summarize, although the overwhelming hardship standard is stringent, it is not preclusive. Accordingly, in deciding *forum non conveniens* motions to dismiss, Delaware trial judges must decide whether the defendants have shown that the *forum non conveniens* factors weigh so overwhelmingly in their favor that dismissal of the Delaware litigation is required to avoid undue hardship and inconvenience to them.").

[4] *See, e.g.*, *Lisa, S.A. v. Mayorga*, 993 A.2d 1042, 1047 (Del. 2010).

Bulgaria. The Plaintiffs, for their part, did *not* choose this Court, or this jurisdiction, as the appropriate forum for resolution of this dispute. Their first choice of forum was Federal District Court in Illinois, where the bank holding company does business, and where they had jurisdiction over an individual defendant resident there, a party defendant in Illinois but not here. This first action was dismissed for lack of diversity. They then tried Illinois state court, where those same defendants sought a dismissal on *forum non conveniens* grounds. That issue was litigated, and the Illinois court, applying that jurisdiction's *forum non conveniens* analysis, dismissed, finding that Bulgaria, not Illinois, was the appropriate venue for this litigation. The Illinois Appellate Court affirmed the trial court's decision, by its own detailed written opinion. While Plaintiffs' petition for leave to appeal was pending before the Illinois Supreme Court, as a third choice the Plaintiffs filed here. After the Delaware action was filed, the Illinois Supreme Court denied Plaintiffs' petition for leave to appeal. The Plaintiffs indicated at oral argument that, if Defendants' *forum non conveniens* motions are granted here, they may seek to litigate in yet another American jurisdiction.

The *forum non conveniens* analysis employed by the Illinois court differs in some respects from that applied in Delaware, and I assume (without deciding) that the determination in favor of a Bulgarian forum in Illinois has no issue-preclusive effect here. I note that no other litigation is currently pending in any forum

4

concerning these issues; therefore, a concern to avoid inconsistent future judgments is not present. It is a fact inescapable, however, that Delaware is not Plaintiffs' first choice of forum, and the extreme deference paid to a plaintiff's first choice of forum is not indicated here. I determine, therefore, that the overwhelming-hardship standard of *Cryo-Maid* and its progeny is inapplicable, and that I must apply my discretion, in the interest of justice, in determining whether this forum is appropriate. In the exercise of my discretion, after considering the facts of this case I find dismissal of this matter appropriate. My reasoning follows.

## I. BACKGROUND[5]

### A. The Parties and Relevant Non-Parties

The Plaintiffs are an investment fund, Gramercy Emerging Markets Fund ("Gramercy"), and two of its wholly owned entities—Balkan Ventures LLC and Rila Ventures LLC (collectively "the Plaintiffs").[6] Gramercy is a "Cayman Islands Exempted Company incorporated in the Cayman Islands" with its principal place of business in Greenwich, Connecticut.[7] Balkan Ventures LLC "is a Delaware limited liability company wholly owned by [Gramercy]" with its principal place of business

---

[5] The facts, except where otherwise noted, are drawn from the allegations of the Complaint and the documents incorporated by reference therein, and are presumed true for purposes of evaluating the Defendants' Motions to Dismiss. Because of the posture of this case, I take notice of certain submissions of the parties as well. *See VTB Bank v. Navitron Projects Corp.*, 2014 WL 1691250, at *1 n.3 (Del. Ch. Apr. 28, 2014).

[6] Compl. ¶ 10.

[7] *Id.* at ¶ 1.

in Greenwich, Connecticut.[8] Rila Ventures LLC is also a "Delaware limited liability company wholly owned by [Gramercy]" with its principal place of business in Greenwich, Connecticut.[9] The Plaintiffs share the same Greenwich, Connecticut address.[10]

The Defendants are Allied Irish Banks, p.l.c. ("Allied") and the Bulgarian-American Enterprise Fund ("BAEF").[11] Allied is an "Irish Public Limited Company" with an office in Chicago, Illinois.[12] Allied has its principal place of business in Dublin, Ireland.[13] BAEF is a "not-for-profit corporation established by the U.S. Congress, and incorporated in Delaware . . . ."[14] BAEF has a mailing address in Chicago, Illinois.

Non-party Bulgarian-American Credit Bank ("BAC Bank") is a Bulgarian-based bank located in Sofia, Bulgaria with a full banking license from the Bulgarian National Bank.[15] Transactions regarding BAC Bank's stock are regulated by the Bulgarian Financial Supervision Commission.[16]

---

[8] *Id.* at ¶ 2.
[9] *Id.* at ¶ 3.
[10] *See id.* at ¶¶ 1–3.
[11] *Id.* at ¶¶ 4–5.
[12] *Id.* at ¶ 4.
[13] Allied's Opening Br., Transmittal Aff. of Ryan T. Costa, Esq., ("Feb. 16, 2015 Costa Aff.") Ex. C.
[14] Compl. ¶ 5.
[15] *Id.* at ¶ 25.
[16] *See id.* at ¶ 34.

*B. Factual Overview*

This action arises from the sale of BAC Bank shares owned by BAEF to Allied, which the Plaintiffs allege violated certain Bulgarian securities laws and thus gives rise to claims for tortious interference, breaches of fiduciary duty, aiding and abetting such breaches and tortious interference, and civil conspiracy in Delaware.[17]

### 1. The Origins of the BAEF and BAC Bank

Congress established BAEF in 1991 pursuant to the Support for East European Democracy Act (the "SEED Act").[18] The SEED Act was intended to encourage American investment in Eastern Europe after the fall of the Soviet Union.[19] In light of this goal, "to fulfill its aim of encouraging American investment in Eastern Europe, the SEED Act provided for the establishment of Enterprise Funds."[20] BAEF is one of such funds.[21] In 1996, BAC Bank was founded in Sofia, Bulgaria, with a banking license from the Bulgarian National Bank, and was initially funded "[u]sing money from BAEF raised primarily in the United States."[22] "The purpose of founding the [BAC Bank] by the U.S. Government was to foster

---

[17] *See id.* at ¶¶ 9–17.
[18] *Id.* at ¶¶ 19, 24.
[19] *Id.* at ¶¶ 18–21.
[20] *Id.* at ¶¶ 22, 24.
[21] *Id.*
[22] *Id.* at ¶ 25.

democracy in Eastern Europe, a mission the [BAC Bank] was to accomplish by providing loans to small and medium sized businesses in Bulgaria."[23]

### 2. The Plaintiffs Invest in BAC Bank

Prior to April 4, 2006, BAEF held a 65% stake in BAC Bank.[24]  On April 4, 2006, BAEF "issued an IPO through which it sought to reduce its 65% stake in [BAC Bank] to a 53.88% stake."[25]  The Plaintiffs participated in that IPO and bought "approximately 3% of the outstanding shares of [BAC Bank]."[26]  The Plaintiffs eventually increased their investment and "subsequently purchased additional shares which increased their stake in [BAC Bank] to roughly 26%."[27]  The Complaint indicates that Plaintiffs' investment decision was influenced by "statements originating in the United States."[28]

### 3. Sale of BAC Bank Shares by BAEF to Allied

BAEF announced on February 18, 2008, that it entered into an agreement to sell 49.99% of the outstanding shares of BAC Bank to Allied.[29]  At the time of this announcement, "BAEF held 53.88% of the outstanding shares of [BAC Bank]."[30]

---

[23] *Id.*
[24] *See id.* at ¶ 26.
[25] *Id.*
[26] *Id.* at ¶ 27.
[27] *Id.* at ¶ 30.
[28] *Id.* at ¶ 28.
[29] *Id.* at ¶ 32.
[30] *Id.* at ¶ 33.

The Complaint alleges that "pursuant to Article 149 of the Bulgarian Public Offer[ing] of Securities Act, a shareholder purchasing a majority stake in a publicly traded company was, at the time of the purchase, required to file at the Bulgarian Financial Supervision Commission a tender offer for purchase of all outside shares."[31] This amounts to a "mandatory tender offer rule;" if Allied bought a majority of BAC Bank's outstanding shares from BAEF, it was required to make a tender offer to all other holders at a price equal to what it paid BAEF, according to the Bulgarian POSA.[32] The Complaint alleges the transaction was structured with the "goal" of permitting Allied to gain *de facto* control over [BAC Bank] while willfully attempting to avoid the mandatory tender offer rule."[33]

In addition to structuring the sale to avoid the mandatory tender offer rule, the Complaint alleges that there is "circumstantial evidence of a pre-mediated agreement between [Allied] and BAEF . . ." which permitted Allied "to exercise *de facto* majority control over [BAC Bank] through an agreement with BAEF that BAEF would vote its shares in the same manner as [Allied]."[34] Such circumstantial evidence includes a "voting pattern" which suggests that BAEF voted with Allied subsequent to the sale.[35] Prior to the transaction between BAEF and Allied, the

---

[31] *Id.* at ¶ 34.
[32] *Id.* at ¶¶ 34–35.
[33] *Id.* at ¶ 35.
[34] *Id.* at ¶ 43.
[35] *Id.*

"Plaintiffs made repeated demands on Defendants that they abide by the mandatory tender offer rule and offer to purchase Plaintiffs' shares at the price to be paid by [Allied]."[36] The Plaintiffs expressed their concerns via letters to the Defendants but the sale still closed as structured on August 28, 2008.[37] Ultimately, Allied sold its shares in BAC Bank on May 16, 2011, thus the Complaint alleges that from "August 28, 2008 until May 16, 2011, [Allied] exercised control over [BAC Bank] through an agreement with BAEF that allowed for [Allied] to determine the way in which BAEF's shares would be voted."[38]

The Complaint alleges BAEF's then President and Chief Executive Officer, Frank Bauer, who is not a named defendant in this action (but was in Plaintiffs' dismissed Illinois actions), as well as all other members of BAEF's management board, "were beneficiaries of BAEF's incentive program which was tied to profits on asset disposals."[39] Purportedly, this presented a conflict as to "whether to recommend a share sale that would enrich themselves but also violate BAEF's legal duties to minority shareholders, or to vote against the share sale and forego a personal pecuniary gain."[40] The Complaint concludes that even in the face of "the clear risks of participation, BAEF and Bauer participated in the vote to allow [Allied]

---

[36] *Id.* at ¶ 38.
[37] *Id.* at ¶¶ 38–42.
[38] *Id.* at ¶ 44.
[39] *Id.* at ¶ 45.
[40] *Id.* at ¶ 46.

to purchase the vast majority of BAEF's [BAC Bank] shares" and thus "BAEF therefore placed its own financial gain over the duties it owed to [BAC Bank] minority shareholders."[41]

### 4. The Plaintiffs Raised Their Concerns to Bulgarian Regulators

Prior to the closing of the sale from BAEF to Allied in August 2008, the Plaintiffs raised their concerns to various Bulgarian regulators. On April 22, 2008, Gramercy's lawyers in Bulgaria sent a letter to the Bulgarian Financial Supervision Commission.[42] The letter relayed Gramercy's concerns that the transaction was structured to avoid the mandatory tender offer rule and that there was possibly an agreement between the parties to exercise control, "in circumvention of mandatory provisions of the Bulgarian legislation."[43] Gramercy requested that the Bulgarian Financial Supervision Commission investigate any voting agreement.[44] The Bulgarian Financial Supervision Commission replied on May 27, 2008.[45] The Bulgarian regulators noted that the transaction had not yet been finalized, and the mandatory tender offer rule does not attach until more than 50% of voting shares are actually acquired.[46] Further, because the companies would be required to disclose any such agreement upon the close of the transaction the regulator declined to solicit

---

[41] *Id.*
[42] *See* Feb. 16, 2015 Costa Aff. Ex. A-8.
[43] *See* Feb. 16, 2015 Costa Aff. Ex. A-8 at 2–3.
[44] Feb. 16, 2015 Costa Aff. Ex. A-8 at 3–4.
[45] *See* Feb. 16, 2015 Costa Aff. Ex. A-9.
[46] Feb. 16, 2015 Costa Aff. Ex. A-9 at 4.

11

any purported voting agreements from the parties at that time.[47] There are also documents indicating that other regulators, such as the Bulgarian Commission for Protection of Competition, were aware, prior to closing, of Gramercy's challenges to the transaction—specifically that "the transaction has resulted in the circumvention of the [Bulgarian mandatory tender offer rule]."[48] The transaction ultimately closed despite such challenges. Certain regulatory decisions included an appeal process.[49] The record does not disclose whether the Plaintiffs pursued these appeal rights.[50]

### 5. The Illinois Actions

#### a. The Federal Action

The Plaintiffs filed suit in Federal District Court in Illinois, demanding a jury trial, on August 26, 2011. The complaint in the federal action is strikingly similar to the Complaint in the later-filed action here—the Illinois federal action alleges the same counts, on the same factual basis, but includes an additional defendant—Frank Bauer.[51] Other than Bauer the parties are identical, and the claims and facts pled mirror those brought in this action.[52] The federal action was dismissed on December

---

[47] Feb. 16, 2015 Costa Aff. Ex. A-9 at 5.
[48] Feb. 16, 2015 Costa Aff. Ex. A-17 at 3–4.
[49] *See, e.g.*, Feb. 16, 2015 Costa Aff. Exs. A-12, A-18.
[50] I note that it appears appeals were not taken, at least with respect to certain regulatory approvals. *See* Feb. 16, 2015 Costa Aff. Exs. A-13, A-19.
[51] *Compare* Feb. 16, 2015 Costa Aff. Ex. D *with* Compl.
[52] *Id.*

12

13, 2011 for lack of subject matter jurisdiction due to a failure of complete diversity of citizenship.[53]

### b. The Illinois State Court Action

On February 24, 2012, the Plaintiffs filed a complaint in Illinois state court, again demanding a jury trial.[54] The complaint in the Illinois state court action is also strikingly similar to the complaint in the federal action, and the present Complaint.[55] This Illinois action involved the same parties as the present action, except it also included Bauer as a defendant.[56] Like the federal action, the Illinois state action asserted the same claims pled in the present Delaware action on a very similar factual basis.[57]

The Defendants moved to dismiss the Illinois state action for failure to state a claim and on *forum non conveniens* grounds.[58] The Illinois court ordered "extensive discovery to allow the parties to fully articulate their positions."[59] The court applied Illinois *forum non conveniens* law to the motion and dismissed the action, finding that, in light "of the tenuous connection the case has to Illinois, a dismissal in favor

---

[53] Feb. 16, 2015 Costa Aff. Ex. E at 1, 3.
[54] Feb. 16, 2015 Costa Aff. Ex. F at 1.
[55] *Compare* Feb. 16, 2015 Costa Aff. Ex. D and Ex. F *with* Compl.
[56] *See* Feb. 16, 2015 Costa Aff. Ex. F.
[57] *Compare* Feb. 16, 2015 Costa Aff. Ex. D and Ex. F *with* Compl.
[58] Feb. 16, 2015 Costa Aff. Ex. G at 1 (the "Circuit Court of Cook County Illinois Order").
[59] Circuit Court of Cook County Illinois Order at 7.

of Bulgaria better serves the considerations of fundamental fairness, sensible and effective judicial administration and the ends of justice."[60]

The Illinois trial court, in applying its *forum non conveniens* analysis, made the following observations: First, the court noted that Illinois was not the Plaintiff's "home forum" and their choice was therefore entitled to comparatively less deference under Illinois law.[61]  The court also noted that the "Plaintiffs chose to invest in a Bulgarian bank in a transaction governed by Bulgarian securities laws, so the risk of litigation in Bulgaria was foreseeable."[62]  Further the court found that under the applicable Illinois standard "[o]btaining witness participation and access to evidentiary sources favors having the case in Bulgaria."[63]  In support of this finding the court observed that of the witnesses identified at the time "23 of the 25 reside in European Union countries with more than half residing in Bulgaria."[64]  The court also observed that while the Plaintiffs "have attempted to frame their claims as recognized Illinois causes of action, their entire case is based on a violation of Bulgaria's Public Offering Securities Act."[65]  Further, the Court found that "the courts and the public in Bulgaria have a significant interest in this controversy.  The alleged conspiracy to defraud foreign investors in one of its largest banks presents a

---

[60] *Id.*
[61] *Id.* at 4.
[62] *Id.* at 3.
[63] *Id.* at 5.
[64] *Id.*
[65] *Id.* at 6.

14

compelling interest in the subject matter."[66]  Finally, the court observed that "[t]he strong connection to Bulgaria cannot be ignored.  Plaintiffs' whole case is based on Defendants' alleged avoidance of a Bulgarian security law—a law which does not exist in Illinois."[67]

The Plaintiffs appealed the trial court's June 27, 2013 dismissal to the Illinois Appellate Court.  On July 28, 2014, the Illinois Appellate Court affirmed the trial court's decision via a twenty-three page written opinion, finding the trial court did not abuse its discretion in dismissing in favor of Bulgaria.[68]  The Plaintiffs then petitioned for leave to appeal.  The Illinois Supreme Court refused Plaintiffs' appeal on November 26, 2014.[69]  I note the Complaint in the present Delaware action was filed on November 5, 2014 and the Defendants moved to dismiss this action on February 16, 2015.

6. The Purchase Agreement

BAEF and Allied entered into a purchase agreement (the "Stock Purchase Agreement") which governed the sale of BAC Bank shares from BAEF to Allied.[70] The Plaintiffs were *not* parties to this agreement; in fact, they assert that existence

---

[66] *Id.* at 7.
[67] *Id.*
[68] Feb. 16, 2015 Costa Aff. Ex. H at 1–2.
[69] *Gramercy Emerging Markets Fund v. Allied Irish Banks, p.l.c.*, 21 N.E.3d 714 (Ill. 2014) (TABLE).
[70] *See* Pls' Answering Br., Transmittal Aff. of Amanda L. Devereux, Esq., Ex. 7 (the "Stock Purchase Agreement").

15

of this agreement was first revealed during *forum non conveniens* discovery in the Illinois actions. Section 8.12 of the Stock Purchase Agreement provides a Delaware choice of law clause indicating that "[t]his Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware . . . ."[71] Additionally, Section 8.13 of the Stock Purchase Agreement provides that "[a]ny suit, action or proceeding against any Party hereto arising out of or relating to this Agreement or any transaction contemplated hereby may be brought in any federal or state court located in the [S]tate of Delaware . . . ."[72] Further, Section 8.4 indicates that there are no third-party beneficiaries to the contract and that the "Agreement is for the sole benefit of the parties hereto . . . and nothing herein express or implied shall give or be construed to give any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder."[73] The parties to the contract were defined as BAEF and Allied.[74]

### C. Procedural History of this Action

The Plaintiffs filed their Complaint in this action on November 5, 2014. The Complaint pleads five counts. Count I asserts a claim for tortious interference with prospective business advantage against BAEF, for allowing Allied to purchase

---

[71] Stock Purchase Agreement § 8.12.
[72] *Id.* at § 8.13.
[73] *Id.* at § 8.4.
[74] *Id.* at § 1.1.

49.99% of BAC Bank "with knowledge that [Allied] would circumvent the share purchase requirements under applicable law."[75] Count II asserts a breach of fiduciary duty claim against BAEF, as a majority and controlling shareholder of BAC Bank, for allowing Allied's purchase which was "deliberately structured in an impermissible and unlawful attempt to avoid the mandatory tender offer rule under applicable law."[76] Count III asserts a breach of fiduciary duty claim against Allied, as the "controlling shareholder" from "August 28, 2008 until May 16, 2011" for breach of its fiduciary duties by "refusing to offer to Plaintiffs and all other minority shareholders a tender offer in connection with its August 28, 2008 purchase of *de facto* control over [BAC Bank] as provided for by Bulgarian law."[77] Count IV asserts against BAEF a claim for aiding and abetting tortious interference and a breach of fiduciary duty.[78] Finally, Count V asserts a claim of civil conspiracy against BAEF and Allied for conspiring to avoid the mandatory tender offer rule and taking overt acts in furtherance of such agreements.[79] Each of these causes of action depends, directly or secondarily, upon the application of Bulgarian Securities Law, specifically, Article 149 of the Bulgarian POSA.

---

[75] Compl. ¶¶ 50–59.
[76] *See id.* at ¶¶ 60–66.
[77] *See id.* at ¶¶ 67–72.
[78] *See id.* at ¶¶ 73–80.
[79] *See id.* at ¶¶ 81–85.

Each Defendant moved to dismiss the Complaint on February 16, 2015 on several grounds, including failure to state a claim, lack of personal jurisdiction and *forum non conveniens*. The other grounds for Defendants' Motions to Dismiss were reserved, and the parties have proceeded solely on the *forum non conveniens* portion of the motions.[80] On October 16, 2015, I ordered that discovery provided in connection with the Illinois state action be updated.[81] An initial oral argument was held on May 5, 2016. I requested supplemental briefing from the parties regarding the appropriate standard of review under the unique facts of this case. Following submission of supplemental briefing, a second oral argument was held on September 14, 2016. This Memorandum Opinion addresses Defendants' Motions to Dismiss on *forum non conveniens* grounds.

## II. ANALYSIS

Stated simply, the Plaintiffs' first choice of a forum was Illinois, presumably because that state's courts had jurisdiction over a greater number of potential defendants than other American jurisdictions, and because (unlike Delaware) at least some relevant actions—at least with respect to the Plaintiffs' conspiracy theories— arguably took place in Illinois.[82] The Defendants sought a dismissal, arguing

---

[80] *See* Order Regarding Briefing on Motions to Dismiss (Oct. 16, 2015); May 5, 2016 Oral Argument Tr. 5:12–6:17 (indicating the parties are only proceeding on *forum non conveniens*).
[81] *See* Order Regarding Briefing on Motions to Dismiss (Oct. 16, 2015).
[82] *See* Feb. 16, 2015 Costa Aff. Ex. H. The intermediate appellate decision by the Appellate Court of Illinois First Judicial District noted that the "plaintiffs contend the situs of the injury in Chicago entitles them to substantial deference." *Id.* at ¶ 22. It appears the Plaintiffs, in their earlier

18

Bulgaria was the appropriate forum for any litigation. Plaintiffs' action was accordingly dismissed by the Illinois state trial court on *forum non conveniens* grounds in favor of Bulgaria—a decision affirmed by the Illinois Appellate Court. After the Illinois Appellate Court affirmed the trial courts dismissal, but before the Illinois Supreme Court denied Plaintiffs' petition for leave to appeal, the Plaintiffs filed this near-identical case in Delaware, and rely on our supposedly more-plaintiff-friendly *forum non conveniens* standard for a result more favorable than received in the Prairie State.[83]

My analysis, detailed below, must begin with whether the *Cryo-Maid* or *McWane* standard applies here. The answer, to me, is made obvious by considering that, if the Plaintiffs had initially responded to the Defendants' motions to dismiss in Illinois by filing this action in Delaware—before the Illinois trial court had an opportunity to consider the motion—the Delaware placeholder action would clearly have been subject to a *McWane* analysis on a motion to dismiss in Delaware. I see no basis to employ a more plaintiff-friendly analysis here, simply because the Plaintiffs were unsuccessful in Illinois before making this second-choice Delaware filing.

---

litigation, asserted a theory that the purported secret voting agreement was related to a January 2008 meeting in Chicago. *See id.*

[83] Obviously, a decision of the Illinois court that Illinois is a fatally-inconvenient forum for this litigation is not *res judicata* of whether a Delaware forum is appropriate. Because of my decision here, I need not decide whether the Plaintiffs are precluded from re-litigating particular issues addressed by that court.

19

*A. The Applicable Standard*

"A *forum non conveniens* motion is addressed to the trial court's sound discretion."[84] However, that discretion is not unlimited, and this Court must follow the analysis prescribed by our Supreme Court.[85]

Our Supreme Court has recognized two principal *forum non conveniens* doctrines.[86] As recently explained in *Lisa, S.A. v. Mayorga*,[87] the two doctrines of "overwhelming hardship and *McWane*—operate consistently and in tandem to discourage forum shopping and promote the orderly administration of justice 'by recognizing the value of confining litigation to one jurisdiction, whenever that is both possible and practical.'"[88] Which doctrine applies depends, primarily, upon the posture of the case and the considerations which flow from that posture. The Supreme Court has indicated, "[i]t is a well settled rule of Delaware law that defendants moving to dismiss a *first-filed* suit on the ground of *forum non conveniens* must establish with particularity that they will be subjected to overwhelming hardship and inconvenience if required to litigate in Delaware."[89] However, under certain circumstances the *McWane* doctrine, as interpreted in *Lisa*,

---

[84] *Martinez v. E.I. DuPont de Nemours & Co.*, 86 A.3d 1102, 1104 (Del. 2014) (citation omitted).
[85] *See, e.g.*, *id.* at 1105 n.11 (collecting cases where the Supreme Court reversed trial court determinations that the overwhelming-hardship standard was met).
[86] *See Lisa, S.A. v. Mayorga*, 993 A.2d 1042, 1047 (Del. 2010).
[87] *Id.*
[88] *Id.* (quoting *United Phosphorus, Ltd. v. Micro-Flo*, 808 A.2d 761, 764 (Del. 2002)).
[89] *Id.* (citations omitted) (emphasis supplied by Supreme Court).

20

attaches and provides a trial court broader discretion in analyzing a motion to dismiss on *forum non conveniens* grounds.[90]  Thus, as a threshold issue, I must determine which doctrine attaches here.

### 1. Overwhelming Hardship

Our Supreme Court recently had occasion to discuss the "origins and meaning" of the overwhelming-hardship standard in *Martinez v. E.I. DuPont de Nemours & Co.*[91]  Our case law provides that, when seeking to vitiate a first-filed choice of forum, "a defendant must meet the high burden of showing that the traditional *forum non conveniens* factors weigh so heavily that the defendant will face 'overwhelming hardship' if the lawsuit proceeds in Delaware."[92]  The Supreme Court clarified that perceptions that this test presents an insurmountable burden are "not accurate."[93]  Rather, the Court held in *Martinez* that "'a more restrained meaning is at the essence of the [overwhelming hardship] standard.'"[94]  Specifically, "the overwhelming hardship standard is not intended to be preclusive.  Rather, it is intended as a stringent standard that holds defendants who seek *to deprive a plaintiff of her chosen forum* to an appropriately high burden."[95]

---

[90] *See id.*
[91] 86 A.3d 1102, 1105 (Del. 2014).
[92] *Id.* at 1104 (citation omitted).
[93] *Id.* at 1105.
[94] *Id.* (quoting *IM2 Merchandising & Mfg., Inc. v. Tirex Corp.*, 2000 WL 1664168, at * 8 (Del. Ch. Nov. 2, 2000)) (alterations supplied by Supreme Court).
[95] *Id.* (citation omitted) (emphasis added).

One justification for application of the overwhelming-hardship standard is a deference for a plaintiff's choice of forum.[96] To my mind, this represents the default rule in Delaware: when a plaintiff avails herself of our courts as her first choice of forum, her choice is entitled to the extraordinary deference which the overwhelming-hardship standard provides. Absent such a rule, unwholesome forum shopping would result, comity would be damaged and inconsistent judicial decisions could result. Here, however, Delaware was not Plaintiffs' first choice of forum. Rather the Plaintiffs filed their suit in Delaware only after being dismissed by both Federal and State courts in Illinois. In light of this, I turn to a discussion of the other applicable analysis available under our law.

### 2. *McWane* and *Lisa*

*McWane* addresses a scenario where one party has filed in a jurisdiction other than Delaware, and the party-opponent has thereafter filed here.[97] It is obvious that, in such a matter, the factors that weigh so strongly in favor of a first-filed Delaware plaintiff under *Cryo-Maid*—the respect for a plaintiff's choice of forum, to avoid

---

[96] *See, e.g*, *id.*; *Chrysler First Bus. Credit Corp. v. 1500 Locust Ltd. P'ship*, 669 A.2d 104, 107 (Del. 1995) (noting that one of the rationales for the traditional *Cryo-Maid* analysis is the principle that "only in a rare case should a plaintiff's choice of forum be defeated in favor of a later-filed action in another jurisdiction").

[97] *See McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.*, 263 A.2d 281, 282–83 (Del. 1970).

22

forum-shopping and inconsistent judicial decisions—cut just as strongly against the Delaware second filer. A *McWane* analysis directs the court to examine whether the actions arise from the same facts, and whether the first forum can provide justice; if so, the court may freely exercise its discretion to stay or dismiss. Thus, *McWane* and *Cryo-Maid* are simply mirror-image analyses bent on serving the same beneficial interests.

*Cryo-Maid* and *McWane* involve competing litigants with competing choices of forum. But what of a plaintiff who sees an advantage to filing first in another jurisdiction, then, while that action is pending, files in Delaware? That situation was addressed by our Supreme Court in *Lisa*.

### a. The *Lisa* Decision

Because it is central to my rationale here, it is worth reviewing *Lisa* in some detail. In *Lisa*, the Delaware Supreme Court affirmed a Court of Chancery dismissal on *forum non conveniens* grounds.[98] *Lisa* arose from a later-filed Delaware action in which the plaintiff, Lisa S.A. ("Lisa"), a Panamanian corporation, alleged that after it commenced a prior 1998 Florida Action alleging fraud in a 1992 stock sale, the defendants "fraudulently reorganized" in order "to eliminate or diminish Lisa's ability to obtain relief in the 1998 Florida Action."[99] Lisa was the plaintiff in the

---

[98] *Lisa*, 993 A.2d at 1045–48.
[99] *Id.* at 1045.

Delaware action as well as the related earlier-filed Florida actions.[100]  The Delaware

Supreme Court observed that "Lisa's Delaware action was the *last* filed in [a]

complicated family dispute."[101]  Prior to dismissing the Delaware action, the Court

of Chancery stayed the later-filed Delaware action "in favor of the then-pending

first-filed 1998 Florida Action, and held the motion to dismiss in abeyance pending

the outcome of Lisa's appeal in that Florida action."[102]  Following Lisa's

unsuccessful appeal of the dismissal of its 1998 Florida Action, the Court of

Chancery dismissed all claims against the defendants—with certain claims

dismissed on *forum non conveniens* grounds.[103]

In its analysis the Court of Chancery applied the traditional factors provided

by the *Cryo-Maid* standard.[104]  On appeal of the Court of Chancery's dismissal, the

Delaware Supreme Court framed Lisa's argument as asserting

> that the Vice Chancellor misapplied the *forum non conveniens* standard,
> under which (Lisa says) the defendants were required to establish that
> they would be subjected to 'overwhelming hardship' if forced to litigate
> in Delaware.  Lisa argues that although the Court of Chancery
> purported to apply the overwhelming hardship test, in fact it merely
> balanced the hardship to the defendants from being required to litigate
> in Delaware against the hardship to Lisa from having to litigate in the
> defendants' proposed forum-Guatemala.  Lisa contends that the legal
> standard, properly applied, required the Court of Chancery to determine
> whether the defendants made a strong showing that the burden of

---

[100] *Id.* at 1044–46.
[101] *Id.* at 1047 n.16 (emphasis in original).
[102] *Id.* at 1045.
[103] *Id.* at 1045–46.
[104] *See Lisa, S.A. v. Mayorga*, 2009 WL 1846308, at *8–10 (Del. Ch. June 22, 2009) (finding the defendants met the "heavy burden" of showing an overwhelming hardship).

24

litigating in this forum is so severe as to result in manifest hardship to them. The trial court did not do that, Lisa claims, and therefore reversibly erred.[105]

The Supreme Court found that "Lisa's claim is without merit, because the 'overwhelming hardship' standard does not apply to Delaware actions—like this one—that were not 'first filed.'"[106] The Supreme Court emphasized that "[i]ndeed, in all cases where this Court has applied the 'overwhelming hardship' standard, the Delaware action was either the first filed or the only filed action."[107] The Court discussed the deference given to first-filed complaints via the overwhelming-hardship standard,[108] but explained that

> [c]onversely, where the Delaware action is not the first filed, the policy that favors strong deference to a plaintiff's initial choice of forum requires the court freely to exercise its discretion in favor of staying *or dismissing* the Delaware action (the '*McWane* doctrine'). These two *forum non conveniens doctrines*-overwhelming hardship and *McWane*-operate consistently and in tandem to discourage forum shopping and promote the orderly administration of justice by recognizing the value of confining litigation to one jurisdiction, whenever that is both possible and practical.[109]

---

[105] *Lisa*, 993 A.2d at 1046–47 (citations and internal quotations omitted).
[106] *Id.* at 1047.
[107] *Id.* at 1047 n.13 (collecting cases).
[108] *See id.* at 1047 ("Where the Delaware action is the first-filed, the plaintiff's choice of forum will be respected and rarely disturbed, even if there is a more convenient forum to litigate the claim.").
[109] *Id.* (internal quotations and citations omitted) (emphasis supplied by Supreme Court).

The Supreme Court then conducted a *McWane*-style analysis.[110] First, the Court observed that the Delaware action was not the first-filed action.[111] Next, the Court acknowledged that "[a]lthough the parties to the 1998 Florida Action are not identical to the parties in this Delaware case, the 1998 Florida Action squarely implicated the *McWane* doctrine, because it was filed in a jurisdictionally competent court and was 'functionally identical' to the later-filed Delaware action."[112] Further the Court found that "[b]oth actions arose out of a 'common nucleus of operative fact'"[113]—both stemmed from the underlying allegation of fraud in the 1992 stock sale.[114]

The Supreme Court indicated that "[t]he 1998 Florida Action was what propped up this Delaware action. Its dismissal caused that prop to collapse and warranted the dismissal of the Delaware action under *McWane*."[115] Importantly the Supreme Court found "[t]hat the 1998 Florida Action is no longer pending *does not*

---

[110] *See id.* at 1047–48. Our Supreme Court has stated the *McWane* considerations as follows: "[u]nder *McWane* and its progeny, a judge, in the exercise of his or her discretion, may stay or dismiss a later-filed suit where a first-filed suit is pending in a court capable of administering prompt and complete justice, and involves substantially similar parties and issues." *Chadwick v. Metro Corp.*, 2004 WL 1874652, at *2 (Del. Aug. 12, 2004) (TABLE) (citation omitted). I note that the origins of the *McWane* doctrine arise from an inverse set of facts than present in *Lisa*. In a traditional *McWane* circumstance a Delaware action is filed second in an effort to defeat the plaintiff's original choice of forum. *See McWane*, 263 A.2d at 282–83. Our case law, as evidenced by *Lisa*, has evolved past such original circumstance.

[111] *Lisa*, 993 A.2d at 1047.

[112] *Id.* at 1047–48 (quoting *Chadwick*, 2004 WL 1874652, at *2).

[113] *Id.* at 1048 (quoting *Chadwick*, 2004 WL 1874652, at *2).

[114] *Id.*

[115] *Id.*

26

*change the outcome*, even though language in *McWane* speaks in terms of a 'prior action pending in another jurisdiction.'"[116]  Immediately after making this observation, the Court went on to discuss comity principles stating:

> [t]o allow Lisa to proceed with this Delaware action after the dismissal with prejudice of the predicate Florida action, would ignore the binding effect of the Florida adjudication, and create the possibility of inconsistent and conflicting rulings.  That is precisely the outcome *McWane's* doctrine of comity seeks to prevent.  We therefore affirm the Court of Chancery's dismissal of Lisa's action, on *forum non conveniens* grounds, under *McWane*.[117]

### b. *Lisa's Rationale Applied Here*

*Lisa* involved a plaintiff who had filed in Florida, alleging fraud in a stock sale, and sought to redress alleged bad-faith litigation tactics following commencement of that action—as well as vindicate the underlying fraud[118]—via litigation in Delaware; the Florida action was, in the Supreme Court's words, a "prop" beneath the Delaware action—the actions arose from a common nucleus of operative facts, but the causes of action were only "functionally" identical.[119]

Here, by contrast, the Illinois and Delaware actions are, for practical purposes, fully identical.  The Illinois court dismissed in favor of Bulgaria on *forum non*

---

[116] *Id.* (quoting *McWane*, 263 A.2d at 283) (emphasis added).

[117] *Id.* at 1048 (citation omitted).  The Supreme Court noted that the 1998 Florida Action "raises questions of *res judicata* and collateral estoppel," but such doctrines were not the basis of its decision.  *See id.* at 1048 n.19.

[118] *See Lisa*, 2009 WL 1846308 at *9.  The Court of Chancery found that "[i]n order to prevail on either of the remaining counts, Lisa will first have to prove the existence of the underlying fraud alleged to have occurred in Guatemala in 1992."  *Id.*

[119] *See Lisa*, 993 A.2d. at 1047–48.

*conveniens* grounds; Plaintiffs want an American forum; accordingly, they bring the same action here as was dismissed in Illinois, seeking Delaware's plaintiff-friendly overwhelming-hardship standard.

It is, I think, beyond cavil that, had this case been brought prior to the dismissal of the Illinois action, an appropriate motion would have been addressed under the *McWane* analysis, and the Delaware action dismissed or stayed. The *McWane* analysis would have proceeded thusly: The Illinois state action was first-filed, predating the present action by several years. The Illinois state court was "capable of administering prompt and complete justice,"[120] and in fact had greater jurisdictional scope over the litigants than this Court. The parties in each action are nearly identical. The Plaintiffs are the same, and the Defendants are the same, except Bauer is no longer named as a Defendant, presumably because of jurisdictional strictures. Further, the disputes pursued in Illinois and here arise from a common nucleus of operative fact—actually, they are identical: an alleged structuring of a 2008 stock sale that either violated Bulgarian securities law by the nature of its structure or via a purported secret voting agreement. Dismissal would therefore have been proper under *McWane*. The Plaintiffs point out that, unlike in *McWane*, no prior action remains pending; they argue that having litigated and lost in Illinois, they are entitled to the plaintiff-friendly overwhelming-hardship standard here, as

---

[120] *See Chadwick*, 2004 WL 1874652, at *2.

28

though this jurisdiction were their first choice of forum. But this contention runs afoul, not only of incongruity, but of our Supreme Court's analysis in *Lisa.*

*Lisa* clarified that the *forum non conveniens* analysis of *McWane* applies outside the factual scenario of *McWane* itself, and may apply despite the absence of a pending action in another jurisdiction.[121] The Plaintiffs argue strenuously that *Lisa* involved stronger principles of comity than the instant situation; they point out that the Florida court's *substantive* decision in *Lisa* had kicked the "prop" out of the Delaware action, and that an inconsistent result would have been necessary in Delaware for the plaintiff to be successful here, whereas the instant case involves an Illinois dismissal on a non-substantive ground. That is true, but to my mind unpersuasive. *Lisa* involved two (actually, several) related actions; the substantive resolution in Florida served, under principles of comity, as a bar to the Delaware action. The Plaintiffs here have brought two (actually, three) nearly *identical* actions *serially*.[122] The fact that the Plaintiffs waited to lose in Illinois, then take—and

---

[121] *See Lisa*, 993 A.2d at 1048. Evincing *McWane's* evolution, our Supreme Court, beyond its decision in *Lisa*, has also explicitly expanded *McWane* to hold that the doctrine can be invoked when an arbitration proceeding was pending before commencement of a Delaware action. *See LG Elecs., Inc. v. InterDigital Commc'ns, Inc.*, 114 A.3d 1246, 1253 (Del. 2015) (affirming a Court of Chancery dismissal under *McWane* holding "that the parties' arbitration proceeding constitutes a first-filed action for purposes of the *McWane* analysis"). I note the Court's decision in *LG Electronics* relied primarily on the principles of efficiency and consistency of results in reaching its determination that *McWane* should apply. *See id.* at 1252–53.

[122] Requiring the attachment of the overwhelming-hardship standard to this later-filed Delaware action could incentivize such a species of serial litigation. Plaintiff's counsel has candidly admitted that all his client is "trying to do here is get a forum to be heard in the United States." May 5, 2016 Oral Argument Tr. at 58:22–23. Were the overwhelming-hardship standard to attach

29

lose—an appeal in that jurisdiction, before coming to Delaware to litigate the same issues, does not, to my mind, strengthen their case. The fact that the *forum non conveniens* analysis in Illinois differs in some respects from that in Delaware means that the Illinois decision may not be issue-preclusive here, but it does not, to my mind, completely eliminate issues of comity and forum-shopping as concerns. Under *McWane*, a subsequent Delaware action would have been subject to dismissal in favor of an identical first-filed pending action in Illinois; under *Lisa,* the fact that the pending action has been resolved does not necessarily change this result. The Illinois trial and appellate courts, after discovery and on consideration of the positions of the parties, determined that Bulgaria provides an adequate forum and is the appropriate forum for any litigation. I find, based on the record before me, that dismissal under the *McWane* analysis is appropriate.[123]

I note that the Plaintiffs rely on two Delaware Superior Court cases applying the overwhelming-hardship standard following a *forum non conveniens* dismissal in

---

to later-filed Delaware actions such as Plaintiffs' here, litigants could, with little risk, test their ties to another forum for strategic reasons and then file in Delaware and still benefit from the great deference afforded by the overwhelming-hardship standard. Such a result, I believe, is not consistent with inter-state comity.

[123] In further support of the application of *McWane* here, I find instructive certain Delaware Superior Court decisions interpreting *Lisa*. *See, e.g.*, *Chaverri v. Dole Food Co., Inc.*, 2013 WL 5977413, at *2 (Del. Super. Nov. 8, 2013) (applying *McWane* in light of *Lisa* and dismissing a later-filed Delaware action on *forum non conveniens* grounds where a first-filed Louisiana action was already dismissed pursuant to Louisiana's prescription statute, stating that "[t]he Delaware Supreme Court reaffirmed and expanded the *McWane* doctrine when it decided *Lisa v. Mayorga*") (citation omitted) *aff'd*, 2014 WL 7367000 (Del. Oct. 20, 2014).

a prior-filed action.[124]  One, *Trinity Investment Trust, L.L.C. v. Morgan Guaranty Trust Co. of New York*,[125] was decided long before *Lisa* clarified the application of the *McWane* doctrine; the second, *In re Asbestos Litigation*,[126] was decided shorty after *Lisa*; the opinion does not mention *Lisa*, and it appears that the litigants there failed to make the court aware of the decision.[127]  Accordingly I find neither *Trinity* nor *In re Asbestos* persuasive here.

A final argument of the Plaintiffs should be briefly addressed.  The Plaintiffs point to a choice of law and a forum provision in favor of Delaware in the Stock Purchase Agreement, which they learned of during discovery in the Illinois action.  They assert had they known of these clauses they would have brought their action in Delaware initially.  They argue that I should exercise discretion in favor of allowing the action to proceed here, in light of the fact that this information was unknown at the time of the Illinois filing.[128]  This argument, however, overlooks the fact that such provisions were explicitly limited to the parties to that agreement—BAEF and

---

[124] *See* Pls' Supp. Opening Br. at 5–7 (citing *Trinity Inv. Trust, L.L.C. v. Morgan Guar. Trust Co. of N.Y.*, 2001 WL 1221080 (Del. Super. Sept. 28, 2001) and *In re Asbestos Litig.*, 2012 WL 1980414 (Del. Super. May 16, 2012)).

[125] 2001 WL 1221080 (Del. Super. Sept. 28, 2001).

[126] 2012 WL 1980414 (Del. Super. May 16, 2012).

[127] *See id.* at *2 (stating "Delaware law consistently refers to pending cases and the court is aware of no decision applying a differen[t] standard because other similar suits were previously filed and dismissed elsewhere").

[128] Of course, the Plaintiffs did not react to discovery of this contractual provision by seeking dismissal without prejudice in Illinois, in favor of a Delaware filing; far from it.  They continued litigating in favor of their first choice of forum and pursued an unsuccessful appeal.

Allied. The agreement in no way creates a contractual right for another shareholder to sue the parties to that contract in Delaware to enforce purported violations of Bulgarian securities laws. The issues, burdens, and considerations in litigating in Delaware a sale contract governed by Delaware law, between the parties to that contract, are radically different than the burden raised by litigating in Delaware an alleged violation of Bulgarian securities law, premised on a purported secret agreement and accompanying conspiracy. Thus, on the facts of this case, and given the clear terms and intent of the parties to the contract, the provisions in the Stock Purchase Agreement do not require nor favor that this litigation occur in Delaware.

Because of my decision here, I need not reach the question of whether litigation in Delaware would create an overwhelming hardship for the Defendants. I note, however, that I am dubious of the Plaintiffs' assertion that, if the overwhelming-hardship standard attached, they would easily defeat this motion. The following considerations would inform such an analysis, as they inform my decision here under *McWane* and *Lisa*. Plaintiffs' claims in the present action hinge on whether Bulgarian law was violated.[129] I note that Bulgarian regulators, despite having been on notice and responding to Plaintiffs' concerns, did not find such a violation of the Bulgarian POSA existed. The Plaintiffs ask, nonetheless, that I

---

[129] *See*, *e.g.*, Pls' Supplemental Answering Br. 9–10 (stating "Plaintiffs' claims under U.S. law (*e.g.*, tortious interference with prospective business advantage) hinge on Defendants' POSA violation . . . which Plaintiffs do not dispute").

interpret Bulgarian securities law in light of the instant fact pattern, a matter which, according to the record, poses certain questions of first judicial impression.[130] They then ask that I apply that law, find that a violation of Bulgaria's mandatory tender offer rule occurred, and that such violation provides a basis for the causes of actions currently pled in Delaware. This presents questions presumably of keen interest to Bulgaria, but not Delaware. At bottom, the relief sought would require that I find the regulators of Bulgaria failed to enforce their law, or applied their law incorrectly. As noted earlier, it is unclear from this record whether the Plaintiffs pursued rights to review actions of the regulators, and addressing this matter here would, presumably, require me to apply Bulgarian law on exhaustion of remedies, as well as doctrines of deference to regulators, a daunting matter for this Court, and of interest primarily to Bulgaria, not Delaware. Additionally, as the Illinois court noted, the record indicates that a number of the witnesses necessary to the Defendants are in Europe, including in Bulgaria, and there would be some burden securing their testimony. Obtaining the live testimony of some witnesses would

---

[130] *See* Allied's Reply Br., Declaration of Silvy Chernev ¶ 22 (stating "no interpretive decisions (which carry the greatest precedential value) are available regarding what constitutes an agreement under Article 149 of the POSA"). The Plaintiffs point out that Bulgaria is a civil-law country, and that case precedent—and thus the decision of this Court—is accordingly less important to the development of Bulgarian law than would be the case in a common-law jurisdiction; nonetheless, I presume a Bulgarian interest in the development of its law regarding a novel issue. *See Martinez*, 86 A.3d at 1109–10 ("If, as our jurisprudence holds, significant weight should be accorded the neutral principle that important and novel issues of Delaware law are best decided by Delaware courts, then it logically follows that our courts must acknowledge that important and novel issues of other sovereigns are best determined by their courts where practicable.") (citations omitted).

require overseas travel on their part, and would raise questions of the availability of compulsory attendance. Undoubtedly, trial here would require translation of some documents written via the Cyrillic, not Latin, alphabet.

While it is obvious that the Plaintiffs desire to litigate this matter in an American forum, the fact is that the Plaintiffs bought stock in a Bulgarian company regulated by Bulgarian law, and are trying to vindicate a right under that law. A foreign judge blundering in to vindicate such rights under the circumstances present here seems problematic.[131] A decision by this Court could have serious, unintended consequences on the development of Bulgarian law and on conditions for investment of capital in that country.

Delaware's interests in this litigation, in contrast, are sparse. Two of the Plaintiffs are Delaware entities who chose to first sue in Illinois. Each is an on-shore limited liability company wholly owned by a Cayman Islands hedge fund. One of the Defendants—BAEF—is not-for-profit and is a creature of the United States Congress, incorporated in Delaware. There are no novel issues of Delaware corporate governance to be decided. Rather there is a decision to be made whether certain individual actors at the Defendants' respective entities—all of whom are

---

[131] I note that I am cognizant of our case law which indicates that a balancing analysis is inappropriate in a traditional *forum non conveniens* analysis. *See*, *e.g.*, *Mar-Land Indus. Contractors, Inc. v. Caribbean Petroleum Refining*, *LP*, 777 A.2d 774 (Del. 2001). The Supreme Court in *Lisa* characterized *Mar-Land* "as reversing dismissal for *forum non conveniens* because the Court of Chancery inappropriately applied a balancing test to a Delaware lawsuit that was *the only action filed*." *Lisa*, 993 A.2d at 1047 n.13 (emphasis added).

34

outside of Delaware—structured a transaction which violated Bulgarian securities law.

Accordingly, I note that Plaintiffs' first choice of forum resulted in a decision that justice required the litigation to proceed, if at all, in Bulgaria; that issues of Bulgarian law would require expert testimony; and that the Illinois courts' determination—that notions of efficiency and comity indicate that a dismissal on *forum non conveniens* grounds would be just—appear to be supported by the record here.[132]  In light of these considerations, the outcome here if *Cryo-Maid* applied is by no means obvious.  At any rate, all these factors inform my exercise of discretion in favor of dismissal here, consistent with *McWane* and *Lisa*.

### III. CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss are granted.  An appropriate order accompanies this Memorandum Opinion.

---

[132] I note that the parties vigorously dispute the head-count and location of witnesses and the location and language of relevant documents.  The only thing that is clear from this dispute is that many documents and witnesses are abroad, primarily in European Union nations including Bulgaria, while none are in Delaware.

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

GRAMERCY EMERGING MARKETS )
FUND, BALKAN VENTURES LLC, )
and RILA VENTURES LLC, )
                              )
          Plaintiffs, )
                              )
     v.                      ) C.A. No. 10321-VCG
                              )
ALLIED IRISH BANKS, P.L.C. and )
BULGARIAN-AMERICAN )
ENTERPRISE FUND, )
                              )
          Defendants. )

## ORDER

AND NOW, this 30th day of December, 2016,

The Court having considered Defendants' motions to dismiss, and for the reasons set forth in the Memorandum Opinion dated December 30, 2016, IT IS HEREBY ORDERED that Defendants' Motions to Dismiss are GRANTED.

SO ORDERED:


                                     <u>/s/ Sam Glasscock III</u>

                                      Vice Chancellor